**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
PITTSBURGH**

AHMAD FLETCHER,           )
                                     )
            Plaintiff,          )    Civil Action No.: 2: 20-cv-1004
                                     )
vs.                             )    United States Magistrate Judge
                                     )    Cynthia Reed Eddy
TONYA COULDWELL and R. TUCKER,   )
                                     )
            Defendants.       )

**MEMORANDUM OPINION[1]**

**CYNTHIA REED EDDY, United States Magistrate Judge**

Plaintiff, Ahmad Fletcher, pro se, brings this civil rights action pursuant to 42 U.S.C. § 1983, raising constitutional claims arising from an event which began on February 22, 2020, during a cell search of Fletcher's cell at the Allegheny County Jail.  Named as defendants are two Allegheny County Jail corrections officers: Tonya Caldwell and Ryan Tucker, who have been sued in their individual and official capacities (hereinafter referred to collectively as the "County Defendants).[2]  Fletcher seeks compensatory damages in the amount of $50,000.00 against each defendant jointly and severally, as well as punitive damages in the amount of $50,000.00 against

---

[1]     The parties have consented to the jurisdiction of a United States Magistrate Judge to conduct all proceedings in this case, including trial and entry of judgment. (ECF Nos. 7 and 19). The Court has subject matter jurisdiction over the controversy pursuant to 28 U.S.C. § 1331.

[2]     Plaintiff in his complaint spells the name "Caldwell" as "Couldwell," and identifies Ryan Tucker as "R. Tucker."  The Court will use the correct spelling, "Caldwell," and identify Defendant R. Tucker by his full name.  For ease of reference, the Court adopts the spelling provided by the County Defendants in their filings which are part of the summary judgment record.

each defendant jointly and severally.  The Complaint filed at ECF No. 5 remains Fletcher's operative pleading.

After the close of discovery, the County Defendants filed the instant motion requesting the entry of summary judgment in their favor. (ECF No. 66).  Fletcher filed a brief in opposition to the motion arguing that summary judgment should not be granted because genuine issues of material facts are in dispute.  (ECF No. 80).  The issues are fully briefed and the factual record thoroughly developed.  (ECF Nos. 67, 68, 81, and 82).  After carefully considering the motion, the material in support and opposition to the motion, the memoranda of the parties, the relevant case law, and the record as a whole, the motion will be denied in part and granted in part.

## I.     Relevant Facts[3]

At all relevant times, Fletcher was a federal prisoner housed at the Allegheny County Jail ("ACJ") during the pendency of his criminal proceedings in this Court filed at Criminal No. 19-cr-8.  On July 15, 2020, Fletcher pled guilty to one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), and was sentenced in this Court to a term of imprisonment of 24 months, with 12 months to be served concurrently with the sentence previously imposed at case number 1:15-cr-267 in the Northern District of Ohio and 12 months to be served consecutively to the sentence imposed at case number 1:15-cr-267 in the Northern District of Ohio. Fletcher was transferred from ACJ on August 4, 2020. (ECF No. 67-1 AT P. 2 ("Inmate Permanently Released); *see also* Fletcher's Notice of Change of Address filed 9/24/2020 (ECF No. 12).

---

[3]     The relevant factual background is taken from the summary judgment record and is viewed in the light most favorable to Fletcher, as he is the non-movant.

The events giving rise to the case occurred on February 20, 2020.  According to the Incident Report filed by Defendant Tucker, at approximately 9:30 AM on February 20, 2020, he was conducting window checks when he detected a strong odor of smoke at Fletcher's cell and "during the subsequent guard tour cleaning chemicals were found."  (ECF No. 67-4 at p. 2).  Fletcher admitted that the chemicals were his, but the smoke was not.  Defendant Tucker reported that Fletcher "appeared to be under the influence of some unknown substance."  *Id*.  Fletcher was told that he would be issued an informal resolution.

At approximately 4:30 PM that same afternoon, Defendant Caldwell was conducting a guard tour, and while walking passed Fletcher's cell, she detected "an odor of smoke coming from the cell." (ECF No. 67-4 at p. 2).  Defendant Caldwell continued the guard tour and made a "call for staff to report to the pod none emergency." *Id*.  When Defendant Tucker arrived on the pod to conduct window checks, Defendant Caldwell asked him to start at Fletcher's cell "due to the odor of smoke and the suspected contraband inside the cell." *Id*.  According to Defendant Caldwell's incident report, she returned to Fletcher's cell accompanied by Defendant Tucker and,

> advised inmate Fletcher to step out for window checks, the cell door was opened, and an extraordinarily overpowering smell of smoke emerged from the cell at that time inmate Fletcher stood up from the bottom bunk of the bed and stumbled to gain control of his footing, all while trying to stuff an unknown item  down his pants.  C.O. Tucker advised Fletcher to shake out his pants legs in an attempt to confiscate whatever Fletcher was trying to hide.  Whatever was inside his pants neither officer was able to confiscate due to no staff and myself  being a female. C.O. R. Tucker did have Fletcher remove a layer of red pants he had on two pairs of pants, then was ordered to shake out his other leg and remove his shoes to look inside them a proper search could not be conducted. . . . [I]nmate Fletcher was then ordered to exit the cell and was placed in handcuffs, for his and staff's safety, while I, T. Caldwell conducted a cell search.  During the cell search multiple empty containers of cream, shampoo bottles filled with cleaning solution (not permitted in the cell) torn books, magazines, torn towels soiled with dirt (usually to clean the cell floor and walls), empty toilet paper rolls.  Any contraband or item suspected to be contraband was removed from cell.

*Id. See also* Incident Report, R. Tucker, (ECF No. 67-5 at p. 2).  According to Caldwell's Incident

Report, "at no point did Fletcher ask to have his legal work back . . . ."

Not surprisingly, Fletcher describes the incident much differently.  He alleges that

Defendant Tucker started to perform a strip search with Defendant Caldwell watching from the

doorway of the cell.  He contends that Defendant Tucker made him take off his shoes and then his

only pair of pants.  It was only after Fletcher made "threats of P.R.E.A." did Defendant Tucker

allow Fletcher to put back on his pants.  Declaration of Ahmad Fletcher, ECF No. 81.  After

Fletcher was cuffed and placed outside his cell, Defendant Caldwell then entered his cell and

"began smashing his belongings with the stick" used to tap on windows.  *Id.*  Fletcher states that

he asked why his legal work was being tossed from his cell, and was told by both Defendants to

"shut up."  Additionally, when Fletcher saw that his K.O.P. medication was being thrown out of

his cell, he stated, "that is my medication prescribed to me by medical for the pain in my hands"

and he begged both Defendants not to take his medication.  *Id.* at ¶¶ 10-11.  According to Fletcher,

none of the items that Defendant Caldwell tossed was considered contraband.  *Id.* at ¶ 9.  When

Fletcher looked back into his cell, he then saw Defendant Caldwell pouring his hair gel onto his

bed and blankets.  *Id.* at ¶ 12.  After the cell inspection was finished, Defendant Caldwell had

Fletcher's personal items and legal work placed in separate trash bags.  She then told Fletcher she

was "sending it to I.A. to be tested for drugs."  Fletcher was permitted to return to his cell, but he

did not have access to his medication, or any other personal items that were disposed of during the

cell search, such as "toothbrushes, toothpaste, soap, and toilet paper," for a period of nineteen

hours.

## II.     Standard of Review

The standard for assessing a Motion for Summary Judgment under Rule 56 of the Federal Rules of Civil Procedure is well-settled.  A court should grant summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Furthermore, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 250.  A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome under applicable substantive law. *Anderson*, 477 U.S. at 248. An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Id.* at 257.

On a motion for summary judgment, the facts and the inferences to be drawn therefrom should be viewed in the light most favorable to the non-moving party.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc*., 369 U.S. 654, 655 (1962)).  The moving party has the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact.  The party opposing the motion, however, cannot rely merely upon bare assertions, conclusory allegations, or suspicions to support its claim.  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita,* 475 U.S. at 586, and must produce more than a "mere scintilla" of evidence to demonstrate a genuine issue of material fact.  *See Big Apple BMW, Inc. v. BMW of North America, Inc*., 974 F.2d 1358, 1363 (3d Cir. 1992).

With this standard in mind, the Court now turns to the motion for summary judgment.

**III.    Analysis**

Section 1983 provides that:

Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, . . .

42 U.S.C. § 1983.  Thus, to state a claim for relief under this provision, a plaintiff must demonstrate that (1) the alleged misconduct was committed by a person acting under color of state law; and (2) that such conduct deprived the plaintiff of rights, privileges, or immunities secured by the Constitution or laws of the United States.  *West v. Atkins*, 487 U.S. 42, 48 (1988).  Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979).

**a.    State Action**

The parties agree that the County Defendants were acting under the color of state law at all relevant times.

**b.    Counts I and II**

Counts I and II of the Complaint allege that the County Defendants' actions violated Fletcher's rights under the Eighth Amendment.  The County Defendants contend that these actions do not rise to the level of an Eighth Amendment claim.  For the reasons that follow, however, the Court finds that Fletcher's claims do not arise under the Eighth Amendment, but rather arise under the Fourteenth Amendment.  The Court of Appeals for the Third Circuit has held that the "Eighth Amendment's Cruel and Unusual Punishments Clause does not apply until 'after sentence and

6

conviction.'" *Hubbard v. Taylor*, 399 F.3d 150, 164 (3d Cir. 2005) ("*Hubbard I*") (footnote omitted) (quoting *Graham*, 490 U.S. at 392 n.6)).[4]  *See also Murray v. Keen*, 763 F. App'x 252, 255 (3d Cir. 2019) ("sentenced prisoners are protected only from punishment that is 'cruel and unusual' while pretrial detainees are protected from any punishment" (citing *Hubbard I*, 399 F.3d at 166-67)).  *See also Vargo ex rel. Vargo v. Plum Borough*, 376 F. App'x 212, 215 (3d Cir. 2010) ("Because [Fletcher] was a pretrial detainee, we analyze his § 1983 claim under the Fourteenth Amendment's substantive due process protection against arbitrary abuse of government power, his Eighth Amendment protection from cruel and unusual punishment having not yet attached.") (citation omitted).

The County Defendants suggest in their Concise Statement that Fletcher was not a pretrial detainee because he was serving a 120-month sentence of imprisonment imposed by the United States District Court for the Northern District of Ohio.  However, for purposes of his incarceration at ACJ, on February 22, 2020, Fletcher was a pretrial detainee as he was facing new federal criminal charges in the Western District of Pennsylvania.  Those charges remained pending until July 15, 2020, at which time a combined change of plea and sentencing hearing was conducted during which Fletcher pled guilty to one count of conspiracy to money laundering and was sentenced to a term of imprisonment of 24 months.  *See United States v. Fletcher*, Criminal No. 19-cr-8 (ECF Nos.  2192 and 2199).  Thus, for purposes of this analysis, the Court concludes that at the time of the events at issue, Fletcher was a pretrial detainee.[5]

---

[4]    In a § 1983 action with a pro se plaintiff, the Court must "apply the applicable law, irrespective of whether a pro se litigant has mentioned it by name." *Higgins v. Beyer*, 293 F.3d 683, 688 (3d Cir. 2002) (quoting *Holley v. Dep't of Veteran Affairs*, 165 F.3d 244, 247–48 (3d Cir. 1999)).

[5]    *See* MH Specialist Note dated 4/11/2020 ("He is also upset that he was transferred here by Feds over a year ago and case wasn't prosecuted."  (ECF No. 80-5 at p. 10).

Having now concluded that Fletcher was a pretrial detainee at the time of the events complained of in this lawsuit, the Court will address Fletcher's claims of deliberate indifference to a serious medical need (Count I) and his condition of confinement claim (Count II) under the Due Process Clause of the Fourteenth Amendment rather than the Eighth Amendment's cruel and unusual punishments standard.

The Fourteenth Amendment prohibits states from depriving "any person of life, liberty, or property, without due process of law." "The substantive component of the Due Process Clause limits what government may do regardless of the fairness of the procedures that it employs." *Boyanowski v. Capital Area Intermediate Unit*, 215 F.3d 396, 399 (3d Cir. 2000). This "guarantee[s] protect[ion] against government power arbitrarily and oppressively exercised." *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (quoting *Nunez v. Pachman*, 578 F.3d 228, 233 (3d Cir. 2009)). To maintain a substantive due process claim, a plaintiff must establish that he or she has been deprived of a particular interest that "is protected by the substantive due process clause." *Steele*, 855 F.3d at 501.

In *Bell v. Wolfish*, 441 U.S. 520, 535-36 (1979), the Supreme Court established the principle that "under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." In determining what constitutes "punishment," the Court stated that "if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to punishment." *Id.* at 539. In making the determination of whether a challenged condition of confinement amounts to a punishment of a pretrial detainee, " '[a] court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose'." *Hubbard v. Taylor*, 538 F.3d 229, 232 (3d Cir. 2008)

("*Hubbard II*") (quoting *Bell*, 441 U.S. at 538)  "[C]onditions that are reasonably related to a penal institution's interest in maintaining jail security typically pass constitutional muster."  *Bistrian v. Levi,* 696 F.3d 352, 373 (3d Cir. 2012) (citing *Bell*, 441 U.S. at 540).  In contrast, a "particular measure amounts to punishment when there is a showing of express intent to punish on the part of detention facility officials, when the restriction or condition is not rationally related to a legitimate non-punitive government purpose, or when the restriction is excessive in light of that purpose." *Id*. (internal quotations and citations omitted); *see also Hubbard II*, 538 F.3d at 232.

The Court of Appeals has noted that unconstitutional punishment typically involves both objective and subjective components.  *Stevenson*, 495 F.3d at 68.  The objective component requires an inquiry into whether the deprivation was sufficiently serious, and the subjective component asks whether the officials acted with a sufficiently culpable state of mind. *Id.* (citing *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).  As our appellate court observed, the Supreme Court in *Bell* allowed for an inference of mens rea where the restriction was arbitrary or purposeless, or where the restriction was excessive, even if it would accomplish a legitimate governmental objective.

### a.  Denial of Medical Care (Claim One)

The Due Process Clause requires the government to provide appropriate medical care to pretrial detainees.  *City of Revere v. Massachusetts General Hospital*, 463 U.S. 239, 244 (1983). A pretrial detainee's claim of inadequate medical care arises under the Fourteenth Amendment, rather than the Eighth Amendment.  *See Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 581 (3d Cir. 2003).  "The applicable constitutional protection is the Due Process of the Fourteenth Amendment . . . because the failure to do so amounts to punishment without an adjudication of

guilt.  *See Hubbard [I], 399* F.3d at 166."  *King v. County of Gloucester*, 302 F. App'x 92, 96 (3d

Cir. 2008).  In *King*, our Court of Appeals explained:

> In assessing the denial of medical care to a pretrial detainee, the inquiry is whether
> the denial was "imposed for the purpose of punishment or whether it [was] an
> incident of some other legitimate governmental purpose.  *Bell v. Wolfish*, 441 U.S.
> 520 (1979).  That inquiry involves an indirect application of the Eighth Amendment
> deliberate indifference standard:   "the Supreme Court has concluded that the
> Fourteenth Amendment affords pretrial detainees protections 'at least as great as
> the Eighth Amendment protections available to a convicted prisoner,' without
> deciding whether the Fourteenth Amendment provides greater protection." *Natale*,
> 31 F.3d at 581 (quoting *City of Revere*, 463 U.S. at 244); *see also Inmates of
> Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979) (holding that "at
> a minimum the 'deliberate indifference' standard of *Estelle v. Gamble,* must be
> met").

*Id.*  In other words, when evaluating inadequate medical care claims by pretrial detainees, courts

must apply the Eighth Amendment's deliberate indifference standard as articulated by the Supreme

Court in *Estelle v. Gamble*, but must view this inquiry in the context of the standard articulated in

*Bell v. Wolfish*, which applies Fourteenth Amendment due process principles to pretrial detainees,

rather than the cruel and unusual punishment standard. *Montgomery v. Ray,* 145 F. App'x 738, 740

(3d Cir. 2005) (vacating an order and remanding case where district court evaluated pretrial

detainee's claim involving inadequate medical treatment under the same standards as Eighth

Amendment claims, rather than Due Process Clause principles). In *Montgomery*, the Court of

Appeals noted that,

> [T]he Eighth Amendment only acts as a floor for due process inquiries into medical
> and non-medical conditions of pretrial detainees.  While "the due process rights of
> a [pre-trial detainee] are <u>at least</u> as great as the Eighth Amendment protections
> available to a convicted prisoner, *Hubbard*, 399 F.3d at 166 (citation omitted), the
> proper standard for examining such claims is the standard set forth in *Bell v.
> Wolfish*, . . . i.e., whether the conditions of confinement (or here, inadequate
> medical treatment) amounted to punishment prior to an adjudication of guilt.
> *Hubbard*, 399 F.3d at 158.

*Montgomery*, 145 F. App'x at 740 (emphasis and brackets in original).  In order to determine whether the challenged conditions of pretrial confinement amount to punishment, the Supreme Court of the United States has stated:

> [a] court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose.  Absent a showing of an expressed intent to punish on the part of the detention facility officials, that determination generally will turn on whether [it has] an alternative purpose . . . and whether it appears excessive in relation to [that] purpose . . . . Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment."  Conversely, if a restriction or condition is not reasonably related to a legitimate goal – if it is arbitrary or purposeless – a court may permissibly infer that the purpose of the government action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees.

*Bell v. Wolfish*, 441 U.S. at 538-39 (citations, brackets, and internal quotations omitted).  *See also Gunter v. Twp. of Lumberton*, 535 F. App'x 144, 149 (3d Cir. 2013) ("Deprivation of medical care to arrestees violates their Fourteenth Amendment right to due process if it constitutes deliberate indifference to medical needs.").

The deliberate indifference standard under the Eighth Amendment requires the prisoner to show (1) a serious medical need, and (2) behavior on the part of prison officials that constitutes deliberate indifference to that need.  *Estelle*, 429 U.S. at 104; *see also Natale*, 318 F.3d at 582. The County Defendants argue that Fletcher has not met either prong of the *Estelle* test.

     1.    *Serious Medical Need*

The Court of Appeals for the Third Circuit has defined a serious medical need as (1) " 'one that has been diagnosed by a physician as requiring treatment[;]' " (2) " 'one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention[;]' " or (3) one "where the denial of treatment would result in the 'unnecessary and wanton infliction of pain,' or 'a life-

long handicap or permanent loss[.]' " *Atkinson v. Taylor*, 316 F.3d 257, 272–73 (3d Cir. 2003) (quoting *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir.1987).

A medical need is "serious" if it is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Atkinson v. Taylor*, 316 F.3d 257, 272-73 (3d Cir. 2003). A medical need is also serious where the denial of treatment would result in the "unnecessary and wanton infliction of pain," *Estelle*, 429 U.S. at 103, or a "life-long handicap or permanent loss," *Monmouth Cty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987).

The Court agrees with the County Defendants that, in some instances, courts have found that similar skin conditions to Fletcher's are not a serious medical need; however, in those cases the plaintiffs could not show that their condition posed any serious issues or inhibited their daily activities. Here, however, the undisputed summary judgment record reflects that PA Elon Mwaura noted on September 10, 2019, the following:

> Patient is seen in for C or bilateral hand rash
> Denies any other symptoms
> Bilateral only Palmar with a few scattered peeling rash
> A/P possible high hyperhidrosis
> will try an ointment and see if it resolves.

(ECF No. 80-3 at p. 2). The Drug Order in the summary judgment record reflects that Aquaphor External was first prescribed beginning on September 12, 2019, with a stop date of September 23, 2019. (ECF No. 80-2 at pp. 2, 10) and again on January 19, 2020, with a stop date of February 17, 2020. (ECF No. 67-2 at p. 2; ECF No. 80 at p. 2).[6]

---

[6]     In his Statement of Disputed Factual Issues, Fletcher, referring to "Exhibit A" asserts that the drug order sheet in his medical records "shows plaintiff's last refill with no stop date." (ECF No. 82 at p. 1, ¶ 2). However, the Court does not interpret the records that way as the drug order sheet in the summary judgment record has a columns entitled "start" and "stop."

Additionally, the undisputed medical records reflects that on 09/10/2019, the medical staff at ACJ first placed a drug order for Fletcher to have Aquaphor External creme, twice per day. (ECF No. 80-2 at p. 2).  A PA Note dated 2/23/2020, indicates that Fletcher reported that "there was a shake down on pod and [he] lost his KOP aquafor (?had 3 containers) for ?dry skin.  Ordered a short course of vit A&D Oint and [Fletcher] will be seen in clinic to revaluate further need for aquafor."  (ECF 67-8 at p. 4).  On 02/25/2020, Fletcher was seen by LPN Candace Johnson and asked "for aquaphor be reordered; he was just given a refill and a 'CO threw it away' – will sent alert to provider queue."  *Id*. at p. 3.  On March 24, 2020 and again on April 5, 2020, Fletcher was seen by Larry Siix, RN, on the pod during med pass/sick call.  Both times, he reported that he was supposed to have aquafor for his cracked skin/hands but was prescribed A&D.  The medical notes reflect that RN Siix was to alert providers queue with Fletcher's request.  Id. at p. 2.

Given the continued attention and medical treatment provided to Fletcher, it cannot be said at the summary judgment stage that the medical condition, if left unattended, would not pose "unnecessary and wanton infliction of pain."  *Estelle*, 429 U.S. at 103.  The Court finds that the record, considered as a whole, is sufficient to show that Fletcher's skin condition was a serious medical need.

### 2.    *Deliberate Indifference*

Turning to the second prong of the *Estelle* test, a prisoner must show that prison officials acted with deliberate indifference to the prisoner's serious medical needs.  *Natale,* 318 F.3d at 582. In order to find that state officials acted with deliberate indifference, a plaintiff must prove that the official knew of and disregarded an excessive risk to inmate health or safety. *Id*. (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). The Court of Appeals for the Third Circuit has "found deliberate indifference in a variety of circumstances, including where the prison official (1) knows

of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). " 'Deliberate indifference' is more than mere malpractice or negligence; it is a state of mind equivalent to reckless disregard of a known risk of harm." *Andrews v. Camden Cnty.*, 95 F.Supp.2d 217, 228 (D.N.J. 2000) (citing *Farmer*, 511 U.S. at 837–38). Thus, "in order to survive a summary judgment motion, in which the movant argues that there is an absence of evidence to support [the plaintiff's] case, the plaintiff must point to some evidence beyond [his] raw claim that [defendant] was deliberately indifferent." *Singletary v. Pa. Dep't of Corr.*, 266 F.3d 186, 192 n. 2 (3d Cir. 2001) (citing *Celotex*, 477 U.S. at 325). In other words, the plaintiff must come forward with "some evidence 'that [defendant] knew or was aware of [the] risk [to plaintiff].' " *Id.*

The County Defendants characterize this claim as a disagreement over medical care, which would not give rise to a constitutional claim. *United States  ex rel. Walker v. Fayette County*, 599 F.3d 573, 575 n.2 (3d Cir. 1979).  Fletcher responds that he "has no complaint about the medical treatment he received . . . Plaintiff's suit is about the destruction of said medication by the defendants and the pain and suffering as a result of said actions."  Pl's Br. at p. 2 (ECF No. 80).

Fletcher asserts that during the search of his cell, he pleaded with the County Defendants not to throw away his medications, but they ignored his plea.  Construing the summary judgment evidence of record in the light most favorable to Fletcher, the Court concludes that a reasonable jury could find that the destruction of Fletcher's medications amounted to punishment prior to adjudication of guilt in violation of the Fourteenth Amendment because a reasonable jury could conclude from the evidence of record that the County Defendants' actions were deliberately

indifferent to Fletcher's serious medical needs.  Accordingly, summary judgment will be denied on this claim.

### b.  Conditions of Confinement (Claim Two)

Claim Two overlaps with Fletcher's claim of deliberate indifference to his serious medical needs.  The heart of this claim is that the County Defendants violated his constitutional rights after completing his cell search because he went without his hand medication and other personal items such as "toothbrushes, toothpaste, soap, and toilet paper" for a period of nineteen (19) hours.  The County Defendants argue that Fletcher's condition of confinement claim also fails as a matter of law.

Although it remains somewhat unclear as to what level of protection is afforded to pretrial detainees under certain claims,[7] the Court of Appeals for the Third Circuit has broadly held in the context of nonmedical conditions of confinement claims that pretrial detainees "are entitled to greater constitutional protection than that provided by the Eighth Amendment."  *Hubbard I*, 399 F.3d at 167 n.23.  *Bell* established a two prong standard for determining whether conditions of confinement violate Due Process:  Whether the questioned "restrictions and practices" (1) "are rationally related to a legitimate nonpunitive governmental purpose[,]" and (2) "whether they appear excessive in relation to that purpose."  *Id*. at 561.  The first prong of the *Bell* analysis requires a two-part inquiry, analyzing "first, whether any legitimate purposes are served by [the] conditions [of confinement], and second, whether these conditions are rationally related to these purposes." *Hubbard v. Taylor*, 399 F.3d 150, 159 (3d Cir. 2005).

---

[7]      *See Wharton v. Danberg*, 854 F.3d 234, 247 (3d Cir. 2017) ("The protections of the Eighth Amendment and Due Process Clauses are sometimes, but not always, the same." (quoting *Hubbard I*, 399 F.3d at 164–67)).

According to Fletcher, his medications and personal items were withheld from him needlessly.  The County Defendants counter stating, *inter alia*, that "Plaintiff cannot show that he was exposed to a substantial risk of serious harm or that Defendants' actions amounted to deliberate indifference to such a harm"  Br. at 10.

The undisputed record evidence shows Fletcher filed an Inmate Complaint on 02/23/2020 reporting that,

> On 2/23/2020, I asked C/O Tucker to call a medical emergency due to me not having creams prescribed to me for 19 hours, which is causing my hands to crack and bleed.  The med nurse informed me at or about 11:40 pm that I should have the c/o call so that I can be seen by a professional.  I then left the med-line counter and went to C/Os desk showing my hands and was told by C/O Tucker "No" that he would not call saying my pain is "faked."  It is not the C/Os job or within the scope of his duties to assess my pain and [illegible] me medical [illegible].

(ECF No. 80-4 at p. 2).  On 03/11/2020, the Inmate Complaint was found to be "valid," and it was noted that the Captain would "speak to this officer about your medical needs."  (ECF No. 80-4 at p. 3).

The Court finds that there is evidence in this record from which a reasonable jury could find that the nineteen (19) hour delay in providing Fletcher his prescriptive cream, especially after the summary judgment record reflects that he reported that his hands were cracked and bleeding and requested medical attention, and his personal items amounted to punishment prior to adjudication of guilt in violation of the Fourteenth Amendment because a reasonable jury could conclude from the evidence of record that the actions of the County Defendants posed an excessive risk to Fletcher's health and safety.  Accordingly, summary judgment will be denied on this claim.

c.      **Count III**

Fletcher contends that the strip search conducted by Defendant Tucker violated his Fourth Amendment right and caused him "suffering and emotional distress."  Complaint, at ¶ 28 (ECF No. 5).  The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures."  U.S. Const. amend. IV. To set forth a plausible Fourth Amendment claim, a prisoner must allege that the strip search was unreasonable.  *Marrow v. Pennsylvania*, No. 18-cv-00931, 2018 WL 4963982, at *4 (M.D. Pa. Oct. 15, 2018) (citing *Payton v. Vaughn*, 798 F. Supp. 258, 261-62 (E.D. Pa. 1992)).  Moreover, while a strip search may constitute  "significant intrusion on an individual's privacy," *see United States v. Whitted*, 541 F.3d 480, 486 (3d Cir. 2008), strip searches do not violate the Fourth Amendment in the prison and jail setting when officials conduct searches "in a reasonable manner to maintain security and to prevent the introduction of contraband or weapons in the facility." *Marrow*, 2018 WL 4963982, at *5 (citing *Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 621 F.3d 296, 309-11 (3d Cir. 2010), *aff'd* 566 U.S. 318 (2012)).

The summary judgment record contains conflicting descriptions of strip search.  For example, Defendant Tucker reported that upon opening Fletcher's cell door, it appeared Fletcher,

> tuck[ed] something into his pants, but since no staff and a female officer were present a proper strip search could not be conducted.  It was at this time that inmate Fletcher, who at this point could not stop laughing hysterically, was ordered to remove the extra pair of jail issued red pants he was wearing and to shake out his pants to dislodge any contraband that may have been hidden with in (sic) the waistband of the second pair of reds he was wearing.

(ECF No. 67-5 at 2).  Defendant Caldwell similarly reported,

> Fletcher stood up from the bottom bunk of the bed and stumbled to gain control on his footing, all while trying to stuff an unknown item down his pants.  C.O. Tucker then advised Fletcher to shake out his pants legs in an attempt to confiscate whatever Fletcher was trying to hide.  Whatever was inside his pants neither officer was able to confiscate due to no staff and myself being a female. C.O. R. Tucker

did have Fletcher remove a layer of red pants he had on two pairs of pants, then
was ordered to shake out his other leg and remove his shoes to look inside of them
a proper strip search could not be conducted.

(ECF No. 67-4 at 2).

Fletcher, however, asserts that he only had one pair of "county issued pair of pants on,"
that he was "forced to strip to his boxers in front of a female officer," and that Defendant Caldwell
"could see his exposed body parts." (ECF No. 80). He further asserts that the search was stopped
only after his "threats of P.R.E.A.," after which Defendant Tucker allowed Fletcher to put back on
his pants. In his inmate complaint, Fletcher described the incident as,

> On 2/22/2020, CO Tucker attempted to conduct a strip search of me . . . . while
> C/O Cauldwell watched from the cell doorway after making me remove my shoes,
> pants and shaking out my [illegible]. C/O Tucker finally concided (sic) to my pleas
> of it [illegible] a female c/o present and the search being unlawful and in violation
> of my PREA rights. The search is still unlawful and in violation of any PREA right
> because [illegible] to remove my clothing in front of a female, especially his pants
> is wrong. Also it violates [illegible] to strip a inmate without a SGT present.

Complaint, (ECF 5-1 at p. 3). In response, the Complaint Officer found the complaint "valid" and
replied that "I will speak to both involved with this alleged incident." *Id*. at p. 2.

But notwithstanding these factual discrepancies, and, viewing all facts and the inferences
to be drawn therefrom in the light most favorable to Fletcher, the Court finds that Fletcher's
allegations to not implicate the Fourth Amendment. Defendant Caldwell's mere presence when
the strip search occurred does not suffice to state a claim because there is no violation of a male
inmate's constitutional rights by conducting the strip search in front of other inmates or in the
presence of female officers. There is no evidence in the record that Defendant Caldwell touched
Fletcher, said anything to Fletcher, or conducted any part of the search. *See Small v. Wetzel,* 528
F. App'x 202, 207 (3d Cir. 2013) (holding that strip searches of male inmates in front of female
prison staff during a lockdown were constitutional); *Marrow v. Pennsylvania*, 2018 WL 4963982,

at *5 (M.D.Pa. Oct. 15, 2018) (concluding that a strip search conducted in the presence of female officers did not violate the inmate-plaintiff's constitutional rights).  Finally, allegations that a strip search was degrading or embarrassing also fail to state a constitutional violation.  *See Millhouse v. Arbasak*, 373 F. App'x 135, 137 (3d Cir. 2010) (strip searches, "even if embarrassing and humiliating, do not violate the [C]onstitution").  Moreover, there are no allegations that the strip search was conducted in a physical abusive manner.

The Court of Appeals for the Third Circuit has stated that while a strip search may constitute a "significant intrusion on an individual's privacy," *see United States v. Whitted*,  541 F.3d 480, 486 (3d Cir. 2008), in the prison or detention facility setting, where officials conduct searches in a reasonable manner to maintain security and to prevent the introduction of contraband or weapons in the facility, strip searches do not violate the Fourth Amendment.  *See Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 621 F.3d 296, 309-11 (3d Cir. 2010).  Further, strip searches can be conducted by prison officials without probable cause.  *Jones v. Luzerne Cty. Corr. Facility*, No. 3: 10-cv-0359, 2010 WL 3338835, at *8 (M.D.Pa. Aug. 23, 2010) ("[I]nmates do not have a right to be free from strip searches." (citing *Bell,* 441 U.S. at 558)).

The Court finds that the summary judgment record fails to contain any evidence from which a reasonable factfinder could conclude that the County Defendants went beyond a reasonable strip search or used unnecessary force during the strip search.  It was reasonable for the County Defendants to perform a strip search in light of the legitimate penological goal of maintaining prison security and checking for contraband.  The overall manner in which the strip search was conducted did not violate Fletcher's constitutional rights, even if in the presence of a female officer.  Fletcher's allegations that he was subjected to a humiliating and degrading strip

search fail to state a valid Fourth Amendment violation.  For all these reasons, summary judgment will be granted to the County Defendants on Fletcher's Fourth Amendment search claim.[8]

### d.   Qualified Immunity

In the alternative, the County Defendants argue that they are entitled to qualified immunity in their individual capacities because "Plaintiff's allegations and the undisputed facts of this matter do not suggest that Defendants acted incompetently or willfully disregarded the law or Plaintiff's constitutional rights. . . . [t]he mere act of conducting a cell search and/or strip search, along with the confiscation of certain personal belongings for drug testing, is not a violation of Plaintiff's constitutional rights."  Br. at 14.

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). Qualified immunity provides not only a defense to liability, but "immunity from suit." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991); *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). As qualified immunity is an immunity from suit, the Supreme Court has "repeatedly. . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Pearson v. Callahan*, 555 U.S. 223, 231-32 (2009).

To determine whether a defendant is entitled to qualified immunity, courts will analyze two factors: (1) whether the plaintiff has shown facts that make out a constitutional rights violation, and if so, (2) whether those rights were "clearly established" at the time of the incident.  *Saucier*

---

[8]     Moreover, assuming, *arguendo*, a violation of ACJ policy, a one-time violation of an internal policy does not automatically rise to the level of a constitutional violation.  A prison policy manual does not have the force of law and does not rise to the level of a constitutional violation. *Mercy Catholic Med. Ctr. v. Thompson*, 380 F.3d 142, 154-55 (3d Cir. 2004).

*v. Katz*, 533 U.S. 194 (2001); *but see Pearson*, 555 U.S. at 232-36 (finding that the sequence set forth in the *Saucier* two-step analysis was no longer mandatory but could be employed at the court's discretion). A court must thus look to the "objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Pearson,* 555 U.S. at 244; *see also Grant v. City of Pittsburgh*, 98 F.3d 116, 122 (3d Cir. 1996) ("[C]rucial to the resolution of [the] assertion of qualified immunity is a careful examination of the record . . . to establish . . . a detailed factual description of the actions of each individual defendant (viewed in a light most favorable to the plaintiff).").

As set forth above, a pretrial detainee's Fourteenth Amendment substantive due process rights are violated when officials are deliberately indifferent to serious medical needs. Here, Fletcher's claim is premised on the argument that his medication was destroyed after he told the County Defendants that he needed the medication, and that he was denied his medication which should have been provided under the operative standard of care, and that he was denied this medication for non-medical reasons.  The Court finds that Fletcher has sufficiently supported a Fourteenth Amendment violation and established that his rights regarding necessary treatment for his skin condition was "clearly established" at the time of the alleged constitutional violation.

The Court need not address the issue of qualified immunity with regard to the strip search claim, as the Court has found that the summary judgment record is void of any facts from which a reasonable factfinder could conclude that the County Defendants violated Fletcher's constitutional during the strip search.

### e.   Municipal Liability / Official Capacity Claims

The final argument made by the County Defendants is that all claims brought against them in their official capacities should be dismissed.  Fletcher does not respond to this argument. For

the following reasons, the Court agrees with the County Defendants and will dismiss all claims brought against the County Defendants in their official capacities.

The Supreme Court of the United States has held that,

> [o]fficial-capacity suits . . . "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690, n. 55 (1978). As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. *Brandon, supra*, 469 U.S., at 471-472. It is not a suit against the official personally, for the real party in interest is the entity. Thus, while an award of damages against an official in his personal capacity can be executed only against an official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself.

*Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985).   Because the individual Defendants are employees of Allegheny County, Fletcher's official liability claims are construed as asserting liability against Allegheny County.

In *Monell v. New York City Dep't of Social Servs.,* 436 U.S. 658 (1978), the Supreme Court of the United States held that municipalities and other local governmental units are "persons" subject to liability under 42 U.S.C. § 1983.  In so ruling, however, the Supreme Court declared that municipal liability may not be premised on the mere fact that the governmental unit employed the offending official, i.e., through application of the doctrine of respondeat superior. Instead, the Supreme Court concluded that a governmental unit may be liable under section 1983 only when its "policy" or "custom," whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, directly inflicted the injury. *Monell*, 436 U.S. at 694. The "official policy" requirement distinguishes acts of the municipality from acts of employees of the municipality, thereby limiting liability to action for which the municipality is actually responsible, *i.e.,* acts that the municipality has officially sanctioned or ordered. *Id*.  In *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986), the Supreme Court further clarified that "municipal liability

under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Id*. at 483 (citation omitted).

Moreover, mere identification of a policy or custom is not enough to establish municipal liability; a plaintiff also must establish causation. In this regard, a plaintiff carries the burden of demonstrating a "plausible nexus" or "affirmative link" between the municipality's custom or policy and the constitutional deprivation at issue. *Board of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 405 (1997) (a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights).

As set forth above, Allegheny County cannot be liable for any constitutional deprivations suffered by Fletcher unless "there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989). The Supreme Court has instructed that "policy" is made when a decisionmaker possessing final authority over the subject matter issues an official proclamation, policy, or edict. *Pembaur,* 475 U.S. at 481. Custom can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law. *Monell*, 436 U.S. at 690.  *See also Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990).

In the case at bar, Fletcher's claims involve actions stemming from one discrete incident. It is well settled that a single incident of unconstitutional behavior, without any direct involvement by a municipal policy maker, is not sufficient to impose municipal liability. *Pembaur,*  475 U.S.

at 479. Thus, Fletcher's allegations are insufficient to state a claim upon which relief may be granted against Allegheny County. Fletcher's official capacity claims, therefore, will be dismissed.

## IV.  Conclusion

After carefully reviewing the undisputed summary judgment record and the parties' arguments, the Court is of the opinion that too many issues of material fact exist for it to grant summary judgment in favor of the County Defendants in their individual capacities. on Fletcher's Fourteenth Amendment claims.  The Court's function is not to make credibility determinations, weigh evidence, or draw inferences from the facts.  Rather, it must simply determine whether there is a genuine issue for trial.

However, with that said, the Court finds that the summary judgment record is void of any facts from which a reasonable factfinder could conclude that the County Defendants violated Fletcher's constitutional during the strip search and, thus, summary judgment will be granted on that claim.

Further, all claims against the County Defendants in their official capacities will be dismissed.

An appropriate Order follows.

Date:  April 11, 2023                          BY THE COURT:


                                               s/Cynthia Reed Eddy
                                               Cynthia Reed Eddy
                                               United States Magistrate Judge

cc:    AHMAD FLETCHER
       74250-067
       F.C.I. ALLENWOOD
       P.O. BOX 2000
       WHITE DEER, PA 17887
       (via United States First Class Mail)

Dennis F. Biondo, Jr.
Allegheny County Law Department
(via ECF electronic notification)